

**SO ORDERED.**

**SIGNED this 11th day of May, 2017.**

_____
LENA MANSORI JAMES
UNITED STATES BANKRUPTCY JUDGE

---

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
## WINSTON-SALEM DIVISION

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| Carol Fisher Carter, | ) | Case No. 17-50262 |
| | ) | Chapter 12 |
| Debtor. | ) | |
| _____ | ) | |

### MEMORANDUM OPINION GRANTING MOTION TO DISMISS

On April 13, 2017 the case of Carol Fisher Carter (the "Debtor") came on for hearing on: (1) Motion to Dismiss Chapter 12 Bankruptcy Case filed on March 13, 2017 by Carolina Farm Credit, ACA ("CFC") (Docket No. 9); (2) Motion to Dismiss Chapter 12 Bankruptcy Case and Joinder to Motion to Dismiss of Carolina Farm Credit, ACA filed on March 14, 2017 by Uwharrie Bank ("Uwharrie") (Docket No. 12); and (3) Motion to Dismiss Chapter 12 Bankruptcy Case filed on March 21, 2017 by Ryan Incorporated Mining ("Ryan Mining") (Docket No. 20). At the hearing, Kristen S. Nardone appeared for the Debtor, Daniel C. Bruton appeared on behalf of CFC, Ashley A. Edwards appeared on behalf of Uwharrie, Jessica V. Shaddock appeared on behalf of Ryan Mining, Kathryn Bringle appeared as Chapter 12 Trustee, and Sarah Bruce appeared on behalf of the Bankruptcy Administrator.

The Debtor was present at the hearing and testified. Additionally, the court took

judicial notice of the Debtor's prior Chapter 13 case (Case No. 16-50228).[1]  At the conclusion of oral arguments, the Chapter 12 Trustee and the Bankruptcy Administrator joined in support of the Motions to Dismiss.  After careful consideration of the entire record in this case, including the Debtor's schedules and statements, the motions and other pleadings, the exhibits, testimony, the record in the Debtor's prior case, and arguments of counsel presented at each hearing held in this case, the court found and concluded that the case should be dismissed, and an Order Granting Motions to Dismiss was entered on May 4, 2017 (the "Order").

## PREPETITION BACKGROUND

The series of events leading up to the filing of this case are complex, with the truth difficult to discern amidst competing narratives.  It appears to the court:

---

[1] Pursuant to Federal Rule of Evidence 201, a court may "judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  FED. R. EVID. 201(b).  A court may properly take judicial notice of the existence of each document in a court file, but may only take judicial notice of the truth of facts asserted in documents such as orders, judgments, and findings of fact and conclusions of law because they state the law of the case under the principles of collateral estoppel and res judicata.  *See Aloe Creme Labs., Inc. v. Francine Co.*, 425 F.2d 1295 (5th Cir. 1970) ("The District Court clearly had the right to take notice of its own files and records and it had no duty to grind the same corn a second time. Once was sufficient."); *see also In re Aerial Transit Co.*, 190 B.R. 464, 467 (Bankr. S.D. Fla. 1996).  In taking judicial notice of schedules and filings in prior cases, courts must be aware of the distinction between taking judicial notice of the *existence* of a document and the truth or falsity of any given document's *contents*.

> In practical effect, such judicial notice of the court's own records is the equivalent of a certificate regarding custody by a judge of a court of record of the district in which the record is kept.  Of the various uses of judicial notice of records, this is the least controversial.  The fact that the documents are genuine does not mean that the court can automatically accept as true the facts contained in such documents. Unless they relate to a preliminary question of admissibility as to which the rules of evidence (other than privilege) do not ordinarily apply, or are not adjudicative facts, statements therein must be admissible under the Federal Rules of Evidence.

*In re Bestway Prod., Inc.*, 151 B.R. 530, 541 (Bankr. E.D. Cal. 1993) (citations omitted), *aff'd sub nom. In re Wetherbee*, 165 B.R. 339 (B.A.P. 9th Cir. 1994), and *aff'd*, 165 B.R. 339 (B.A.P. 9th Cir. 1994) (taking judicial notice of a debtor's prior bankruptcy schedules in a previous case).

The Debtor and her husband, Joe Carter ("Mr. Carter," collectively "the Carters") own and reside on several tracts of real property located in Stanly and Cabarrus Counties in North Carolina comprising approximately 390 acres, with various tracts subject to Deeds of Trust held by Uwharrie and CFC, and subordinate Deeds of Trust held by Ryan Mining and Kirby.

On December 17, 2014, Uwharrie commenced a foreclosure proceeding, and after notice and hearing the court entered an order allowing Uwharrie to sell the subject tracts in satisfaction of its Deed of Trust beginning May 26, 2015 (the "Uwharrie Foreclosure").  On May 27, 2015, CFC initiated its own foreclosure proceeding (the "CFC Foreclosure").

According to Ryan Mining's Motion, on May 28, 2015 the Carters formed a joint venture with Ryan Mining to complete a lake excavation and mining project on their property.  (Docket No. 20).  Through a company named J.F. Carter & Co., Inc., owned 50% by the Debtor and 50% by Mr. Carter, the Carters and Ryan Mining became equal partners in forming Barringer Natural Resources, LLC ("Barringer").  The Carters then leased the portion of their property subject to lake excavation to Barringer.  All costs were to be jointly reviewed by Mr. Carter and Ryan Mining, all revenues deposited into a joint bank account with dual signature control by Mr. Carter and Ryan Mining, and all costs to be paid from the account before profits distributed.  Ryan Mining agreed to provide rock crushers, a front-end loader or excavator, and any additional equipment necessary to crush approximately 40,000 tons of existing rock aggregate located on the property for subsequent gravel sale.  Ryan Mining also agreed to advance $150,000.00 for the purchase of adjacent land to provide better access between the main road and the project site.  Finally, Ryan Mining advanced a $25,000.00 loan to the Carters to help prevent default on an unrelated loan.  The advanced funds were to be repaid prior to any profit distribution from Barringer.  The advances were reduced to writing in the

form of two notes, and on July 21, 2015 the Carters executed a Deed of Trust in favor of Ryan Mining for $175,000.00 to secure the promissory notes (encumbering a 116.46-acre tract of land) subordinate to CFC's Deed of Trust.  Barringer performed the excavation work, funded by Ryan Mining, incurring costs of $373,265.23.  Mr. Carter was to market and sell the gravel, which was believed by Ryan Mining to be worth approximately $600,000.00.

It is not disputed that on August 19, 2015, a sale was held in the Uwharrie Foreclosure, and Uwharrie bid.  However, both the Uwharrie Foreclosure and the CFC Foreclosure were stayed when Mr. Carter filed for Chapter 13 protection in the United States Bankruptcy Court for the Eastern District of North Carolina (Eastern Case No. 15-04884).  On November 23, 2015, Mr. Carter's case was transferred to the Middle District of North Carolina (Middle Case No. 15-51222), and the following day on November 24, 2015 the case was automatically dismissed by the court pursuant to 11 U.S.C. § 521(a)(1) for failure to file schedules within 45 days after the date of filing the petition.

Following dismissal, sales were set in the Uwharrie Foreclosure and the CFC Foreclosure by the respective substitute trustees.  However, the foreclosures were again stayed as the Debtor filed a Chapter 13 case (the "Chapter 13") in the Eastern District of North Carolina (Eastern Case No. 16-00198) on January 13, 2016.  The Debtor filed her schedules on February 29, 2016, and her case was transferred to the Middle District of North Carolina on March 8, 2016 (Middle Case No. 16-50228).  On March 15, 2016, CFC filed a motion to dismiss the Chapter 13.  In a hearing on March 30, 2016, the Carters stated they could raise sufficient funds to pay off the debts in the Debtor's Chapter 13 case through the sale of aggregate or gravel.  On April 5, 2016, the court entered an order continuing the hearing on the motion to dismiss, in the interim prohibiting the debtor from selling aggregate or gravel located on or derived from CFC's real property collateral without obtaining CFC's consent. (Case No. 16-50228, Docket No. 42).

4

On April 15, 2016, Ryan Mining filed an emergency motion to prevent the sale of any gravel. Ryan Mining noted that the Carters had represented that the sale of gravel could generate $1.5 million, sufficient funds to pay off their creditors, but argued that the maximum potential sale value of the gravel was one third of the Carters' representations.  Ryan Mining alleged that the Carters should have known that their valuation was high due to prior attempts to market the gravel, and that the $1.5 million valuation was a delay tactic.  Further, Ryan Mining stated that Barringer directly owned the gravel, an ownership that was not disclosed to the court by the Carters, and that the gravel could not be sold without Ryan Mining's input and/or approval, subject to the Barringer operating agreement.  Ryan Mining further stated that the Debtor did not even claim an interest in the aggregate or gravel in her schedules, and that she does not have an individual interest in the gravel.

Ryan Mining and the Bankruptcy Administrator joined CFC's motion to dismiss, but the hearing was continued several times based on representations by the Carters that they were on the cusp of arranging a large sale of aggregate and gravel, and that there would be significant funds flowing into the estate.  On May 25, 2016, after repeated continuances and no culminated sale, it had become clear that the Debtor's schedules were woefully inaccurate. The court ordered the Debtor to amend her schedules to accurately disclose her assets and liabilities; amended schedules were filed June 5, 2016.  The court entered a second order continuing the hearing on the motion to dismiss on June 10, 2016. The order required that the Debtor obtain consent from both Ryan Mining and the Chapter 13 Trustee for any sale of aggregate or gravel.  (Case No. 16-50228, Docket No. 76).

On July 6, 2016, the court heard the continued hearing on CFC's motion to dismiss, and the court found cause to dismiss the case.  First, pursuant to 11 U.S.C. § 1307(c)(4), the case was dismissed for cause for failure to make timely payments to the

Chapter 13 Trustee in her case.  Second, the court found that the Debtor had made sales without authorization pursuant to the April 5 or June 10, 2016 orders, and that the Debtor therefore directly violated prior orders of this court by unilaterally selling aggregate or gravel.  And third, relying on the factors set forth in *In re Page*, 519 B.R. 908 (Bankr. M.D.N.C. 2014), the court found that the case was filed in bad faith.  In an oral ruling, the court found that the Carters demonstrated a "complete lack of honesty" in representing the facts and a lack of candor with the court.  The court further admonished the Debtor for deficient schedules even after amendment.  Additionally, the court concluded that the Carters were "repeatedly and intentionally evasive in their testimony and even made false statements at times."  The court concluded that the Debtor had engaged in dilatory tactics for a Chapter 13 case that was over the debt limit, and dismissed the case.  On July 7, 2016, the court entered an order dismissing the Debtor's case, enumerating the reasons and incorporating the findings from the hearing the day prior.  (Case No. 16-50228, Docket No. 95).

Following dismissal, both CFC and Uwharrie again scheduled sales in their respective foreclosures, CFC on August 11, 2016 and Uwharrie on August 17, 2016.  In each sale, multiple upset bids were filed.

In the CFC foreclosure, bidding was between three parties: Ben Clifton, an attorney employed by Mr. Carter who formed Barringer and is alleged to be Mr. Carter's partner; James Potts, an acquaintance of Mr. Carter from church;[2] and Ryan Mining.  Between August 22 and October 27, 2016, the parties filed multiple upset bids, with the highest bid of $750,000.00 filed on October 27 by Ryan Mining.  Thereafter, on November 7, 2016, the last day to file an upset bid, James Potts filed an upset bid, the first of an uninterrupted sequence of upset bids.  Each subsequent bid was on the last

---

[2] The Debtor testified that James Potts was a person she knew from church.  She denied having any conversations with James Potts regarding her property or the pending foreclosure sale, but did admit that James Potts spoke with her husband though she claimed not to know what they spoke about.

day to file an upset bid, and in so doing James Potts increased the price he would have to pay for the foreclosed property from $787,500.00 to $1,163,496.17 on January 30, 2017 despite no competing bid.  In response, the substitute trustee sought an order requiring a 95% compliance bond in addition to the 5% deposit required by North Carolina law, and on February 8, 2017, the court entered a consent order granting the motion, with the requirement effective March 1, 2017.  (Docket No. 9, Exhibit B).[3]  On February 28, 2017, James Potts made his final upset bid.

In the Uwharrie foreclosure, bidding was between four parties: Jerry and Joseph Burleson, NC-SDS, LLC, Ben Clifton, and Ryan Mining. After numerous upset bids, Ryan Mining filed a $500,000.00 upset bid, the last bid by any party other than Ben Clifton.  Ben Clifton continued to upset his own bid, and the substitute trustee in the Uwharrie foreclosure sought and obtained a similar order as in the CFC foreclosure. (Docket No. 42, Para. 11).  Ben Clifton's final upset bid was similarly filed February 28, 2017.

As to Ryan Mining, the Carters remained unable to sell any aggregate or gravel for Barringer, and for any sales made, Mr. Carter individually retained the proceeds. On February 15, 2017, Ryan Mining filed a state court complaint against the Carters and J.F. Carter & Co., Inc., raising various state law claims pertaining to the Barringer joint venture including breach of contract, collection, conspiracy, fraud, and unfair and deceptive trade practices (Case No. 17-CvS-131).

On March 10, 2017, the Debtor filed the instant petition for relief under Chapter 12.  March 10, 2017 was the last day that an upset bid could be filed in both foreclosures, and any upset bids at that point would have been the first bids requiring the additional 95% compliance bonds pursuant to the respective court orders.  Additionally, the

---

[3] The Stipulation of Facts also admits the entry of the order in the foreclosure, but while the state court order is clearly dated "This 8th day of February, 2017," the Stipulation states the order was entered on January 8, 2017.  (Docket No. 42, Para. 12).

Debtor's instant case stayed the Ryan Mining lawsuit, where no answer has yet been filed.

CURRENT CASE FILINGS

On March 10, 2017, the Debtor filed her emergency petition under Chapter 12, indicating that she had primarily business debts, that she had 1-49 creditors, $0 - $500,000 in assets, and $1,000,001 - $10 million in liabilities. The Debtor listed her prior Chapter 13 case dismissed in 2016, as well as Mr. Carter's case dismissed in 2015. The Debtor also filed her certificate of credit counseling. No schedules were originally filed, and on March 13, 2017 the court issued a Notice of Filings Due, stating that schedules were due by March 24, 2017.

On March 13, 2017, CFC filed its Motion to Dismiss pursuant to 11 U.S.C. §§ 109(f) and 1208(c), arguing that the Debtor was not eligible to seek Chapter 12 relief as she was not a family farmer, and that the instant case was filed in bad faith as a dilatory tactic to forestall foreclosure. The next day, Uwharrie Bank filed its Motion to Dismiss also asserting bad faith, and joined in CFC's Motion. On March 21, 2017, Ryan Mining filed its Motion to Dismiss, also asserting the impropriety of the Debtor's Chapter 12 election, and asserting bad faith.

On March 23, 2017, the Debtor filed her schedules and Disclosure of Compensation of Attorney for Debtor. On March 28, the Debtor also filed her Statement of Financial Affairs. The Debtor's schedules and statements reflect the following:

- On Schedule A/B the Debtor lists 15 parcels of real property collectively valued at $1,307,606.00 that comprise the Carters' approximately 390-acre farm and home. The Debtor also lists $384,330.47 in personalty largely consisting of: 3 vehicles with the Debtor's ½ interest valued at $6,290.00; $2,500.00 worth of crops, consisting of soybeans and wheat; 14 pieces of "farm and fishing equipment, implements, machinery, fixtures, and tools of trade" including tractors, drills, generators, spreaders, a screening plant, a loader, and poultry equipment with the Debtor's ½

8

interest valued at $73,450.00; and the Debtor's ½ interest of "any farm- and commercial fishing-related property you did not already list" consisting of aggregate or gravel valued at $300,000.00.

- On Schedule D, the Debtor lists six debts totaling $2,022,347.64: (1) a $465,465.91 claim by CFC secured by land valued at $4,772.00; (2) a $41,282.08 claim by CFC secured by unknown property with an unknown value; (3) a $1,000,000.00 claim by Kirby Stone & Timber secured by land valued at $144,877.00; (4) a $175,000.00 claim by Ryan Mining secured by land valued at $144,877.00; (5) a $325,592.17 claim by Uwharrie secured by land valued at $166,132.00; and (6) a $15,007.48 claim by Uwharrie secured by land valued at $166,132.00.

- On Schedule E/F the debtor lists $51,310.30 in priority claims comprised entirely of Cabarrus County and Stanly County real property taxes.  The Debtor also lists $14,432.93 in unsecured claims, including a claim by Ryan Mining based on Ryan Mining's pending state court lawsuit, with an unknown value.[4]

- On Schedule G, the Debtor lists a lease of 100 acres with her son Henry Carter for him to grow crops.

- On Schedule H, the Debtor lists her husband as a co-debtor on all tax claims owed, as well as on the claims by CFC, Uwharrie, Ryan Mining, and Kirby.

- On Schedule I, the Debtor lists monthly income of $1,214.63 as a bus driver for Cabarrus County Schools, plus income of $10,000.00 per month[5] from operation of the business/farm.  The Debtor explains, "Debtor and non-filing spouse also have various farm related ventures, including the lease/rent of farm land to another, row crops of soy beans and wheat, irrigation expansion/aggregate, and are negotiating a new poultry contract. They expect to generate profit from these ventures."

---

[4] Ryan's lawsuit is seeking $548,265.23 against the Debtor, Mr. Carter, and J.F. Carter & Co., Inc. jointly and severally, plus reasonable costs and fees for breach of contract; $175,000.00 at 5.5% from the date of the Promissory Notes until default, and 12% onward until paid in full for collection on the Promissory Notes; $25,000.00 for unfair and deceptive trade practices, trebled; and for a constructive trust requiring conveyance of all funds and other property wrongfully misappropriated.  (Docket No. 20, Exhibit A).  As the claim is contingent and unliquidated, the amount is unknown, but the Debtor's potential unsecured debt is vastly understated.

[5] Despite being married, the Debtor's Schedule I reflects no non-filing spouse, with Part 1 left blank for a non-filing spouse, and "N/A" entered for every line of Part 2 for a non-filing spouse.  The Debtor does, however, acknowledge her husband's income, as for line 8h, "Other monthly income. Specify:" the Debtor lists $5,000.00 as her portion of business/farm income, and separately lists $5,000.00 as her husband's portion of business/farm income, for a total of $10,000.00.

- On Schedule J, the Debtor lists expenses of $6,746.33, and when subtracted from $11,214.63 in income yields monthly net income of $4,468.30. The Debtor and her husband have two dependents, a 19-year-old daughter and a 20-year-old son.

- On the Disclosure of Compensation of Attorney for Debtor, the Debtor has paid $2,320.10 prior to the filing of the statement.

- On the Statement of Financial Affairs, the Debtor reports gross income year-to-date of $4,141.94 in wages, and $32,130.00 from operation of a business. In 2016, the Debtor reports $13,048.17 in gross income from wages, and $52,802.10 from operation of a business. In 2015, the Debtor reports $10,899.00 in gross income from wages, and $47,180.18 from operation of a business. In 2014, the Debtor reports $109,452.28 in income from operation of a business. The Debtor reports both foreclosures by Uwharrie and CFC, as well as the Ryan Mining lawsuit. The Debtor reports a $5,000.00 payment made by Ben Clifton to Davis Nardone, PC on March 10, 2017 for "Attorney Fees – retainer to bill against and to cover court filing fees." The Debtor also reports $500.00 paid to Davis Nardone, PC on February 28, 2017 for "Attorney Fees." And the Debtor discloses an interest in J.F. Carter & Company, Inc., a business engaged in farming from 1988 to the present.

On April 5, 2017, the Debtor filed an Objection to Motions to Dismiss, disputing that she was not a family farmer and that her case was filed in bad faith. (Docket No. 37). The Objection stated a brief would be filed at least 3 days prior to the April 13, 2017 hearing date. On April 10, 2017, the Debtor filed a Brief and Memorandum of Law in Support of Objection to Motions to Dismiss (the "Brief"),[6] which included affidavits from the Debtor, Mr. Carter, and their son Henry Carter. (Docket No. 38). On April 12, 2017, the parties filed a Stipulation of Facts, which also contained a stipulation that all Exhibits attached to the Brief would be admissible as evidence contingent upon the inclusion of full tax returns. (Docket No. 42). Also on April 12, 2017, Uwharrie filed an Affidavit in support of its Motion, attaching the Chapter 13 case Proof of Claim and payoff statements for Uwharrie's claim. (Docket No. 43).

---

[6] The Brief contained exhibits that were not fully redacted, and on April 11, 2017 a Motion to Redact and replacement Exhibits were filed. The order granting the Motion to Redact was signed April 12, 2017.

As set forth in further detail below, at the hearing the Debtor made material statements during her testimony that were inconsistent with her sworn schedules, statements, and affidavit. Also, the Debtor's schedules and statements in the present case are not consistent with the schedules and statements filed in the Debtor's previous case.

### CHAPTER 12 ELIGIBILITY

Eligibility to be a debtor under Chapter 12 of the Bankruptcy Code is determined by 11 U.S.C. § 109(f), "Only a family farmer or family fisherman with regular annual income may be a debtor under chapter 12 of this title." Here, the Debtor is claiming status as a family farmer. Pursuant to § 101(18)(A), a debtor qualifies as a "family farmer" if the debtor is (1) an individual;[7] (2) engaged in a farming operation; (3) whose aggregate debts do not exceed $4,153,150.00; (4) not less than 50% of whose aggregate noncontingent, liquidated debts arise out of a farming operation owned by the individual as of the petition date; and (5) whose income from farming is more than 50% of the individual's gross income for either the most recent prepetition full taxable year or each of the 2nd and 3rd preceding taxable years. 11 U.S.C. § 101(18)(A). Thus, for the Debtor to qualify as a family farmer so as to be eligible for Chapter 12 relief pursuant to § 109(f), the Debtor must meet all five elements of § 101(18)(A), and courts have uniformly held that the burden rests with the Debtor in evidencing eligibility. *See In re Sandifer*, 448 B.R. 382, 387 (Bankr. D.S.C. 2011) (citing *In re Hettinger*, 95 B.R. 110, 112 (Bankr. E.D. Mo. 1989)). *See also In re Tim Wargo & Sons, Inc.*, 869 F.2d 1128, 1130 (8th Cir. 1989); *Cottonport Bank v. Dichiara*, 193 B.R. 798, 801 (W.D. La. 1996); *In re Van Air Flying Serv., Inc.*, 146 B.R. 816, 818 (Bankr. E.D. Ark. 1992); *In re Voelker*, 123 B.R. 749, 750 (Bankr. E.D. Mich. 1990); *In re Cloverleaf Farmer's Co-op.*, 114 B.R. 1010, 1013 (Bankr. D.S.D. 1990); *Matter of Morgan Strawberry Farm*, 98 B.R. 584, 585 (Bankr. M.D. Fla. 1989);

---

[7] Or individual and spouse.

11

*In re Rott*, 73 B.R. 366, 371 (Bankr. D.N.D. 1987).  While the Debtor satisfies the first three elements of § 101(18)(A), the Debtor does not satisfy the final two elements and, thus, is not eligible for Chapter 12 relief.

### The Debtor is an individual

The Debtor in this case, Ms. Carter, is an individual.  She asserts that she, along with her husband, engages in farming.

### The Debtor is engaged in a farming operation

The Debtor argues in her response brief that she and Mr. Carter are engaged in a farming operation, and that they, "lease farmland for growing crops, are planting soybean crops this year, continue to excavate and sell gravel that was dredged from expanding an irrigation lake that provides water for their farming activities, and are in negotiations on restarting the poultry operation."  (Brief p. 5).

At the hearing, the Debtor testified that in 2016, 103 acres of their land were leased to the Debtor's son, who had received a "Young Farmers" grant from the U.S.D.A. to grow soybeans.  The Debtor and her son entered into an oral lease in early 2016, prior to planting time, with repayment on the lease of one fifth of the crop proceeds.  For 2017, the Debtor's son again planned to lease acreage to farm soybeans with a U.S.D.A. grant under a similar oral lease, but had not yet finalized an agreement as it was still too early to plant.[8]  When asked if the Debtor planned to grow soybeans herself, she answered that she hoped someone would plant them, likely her son, but that she had no plans to grow soybeans in 2017.

In addition to soybeans, the Debtor testified at the hearing that she and Mr. Carter were growing timber on a portion of their property.  The Debtor asserts that she

---

[8] The Debtor testified that the last frost is around April 15, and that soybean crops are planted no earlier than that date.

12

is growing 50 acres of pine and additional acreage of hardwood, and at most recent check in 2014, the trees were determined to be in good condition and likely mature for sale in 2019.

And with regards to poultry, the Debtor testified that she is attempting to restart farming poultry. The Debtor had previously farmed poultry, but testified that she had ceased poultry operations in 2014, for lack of quality stock, inability to make necessary repairs, and for periodic house clean-out reasons. The Debtor has put herself on lists seeking a poultry contract, and is hopeful that she will soon acquire a poultry contract as there is a greater demand during the hot summer months. However, the Debtor was not engaged in raising poultry as of the petition date, and is merely hopeful that she will be awarded a contract.

The Debtor also claims that the gravel operation in which the Carters have been engaged with Ryan Mining/Barringer constitutes farming activity. During her testimony, the Debtor stated that years prior she and her husband had dug an irrigation lake on the site of a former lake original to the property but the lake only irrigated half of the Debtor's land, and that the current excavation and sale of aggregate or gravel through Barringer represents an expansion of their irrigation lake so as to provide water to all of the Debtor's land.

The Bankruptcy Code provides an expansive, but not exhaustive list of activities that constitute a "farming operation," including, "farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an unmanufactured state." 11 U.S.C. § 101(21). Bankruptcy courts have previously held that crop farming, either by the debtor directly or by leasing land for farming, constitutes a farming operation, as does growing timber. *See, e.g.*, *In re Teolis*, 419 B.R. 151 (Bankr. D. R.I. 2009) (growing flowering plants, trees, and shrubs); *In re Osborne*, 323 BR 489, 491 (Bankr. D. Or. 2005) (leasing farmland to

grow alfalfa); *In re Glenn*, 181 B.R. 105 (Bankr. E.D. Okla. 1995) (raising timber as a farming operation); In re Burke, 81 B.R. 971, 977 (Bankr. S.D. Iowa 1987) (leasing farmland on a crop share basis). Courts have also found farming to include raising livestock and breeding farm animals. *See, e.g.*, *In re Showtime Farms, Inc.*, 267 B.R. 541 (Bankr. E.D. Tex. 2000) (owning land used for horses that also contained traditional farming facilities, including a barn). In the instant case, the Debtor testified that she leases land for farming, raises timber, and as recently as 2014 raised poultry and is seeking to obtain a new poultry contract. On those bases, the Debtor appears to be engaged in a farming operation.

However, the court concludes that sale of aggregate or gravel does not constitute a farming operation, though the Debtor's bankruptcy schedules, 2016 tax returns, Brief, supporting affidavit, and testimony all treat the sale of aggregate or gravel as part of a farming operation. The Debtor asserts that the lake expansion project constitutes irrigation, and relies on *In re Teolis* for the proposition that watering and irrigation activities constitute farming. 419 B.R. 151 (Bankr. D.R.I. 2009). The Debtor's reliance on *Teolis* is inapposite, as the court in *Teolis* only makes use of the term "irrigation" once, in reference to irrigation *systems* that constitute farm assets. *Id*. at 159. The Debtor has provided no authority—and after extensive searching the court is similarly unable to muster any case law—in support of the proposition that crushing rock and selling the resultant aggregate or gravel constitutes farming, even if the sale is in concert with an alleged irrigation lake expansion.

The Debtor argues that "farming" under the Bankruptcy Code is broad, that the term should be construed liberally, and that courts should evaluate whether a debtor is engaged in farming by looking to the totality of the circumstances. *Osborne*, 323 B.R. at 494 (citing *In re Sugar Pine Ranch*, 100 B.R. 28, 31 (Bankr. D. Or. 1989)). In evaluating the totality of the circumstances, courts have considered:

1. Whether the location of the operation would be considered a traditional farm;
2. The nature of the enterprise at the location;
3. The type of product and its eventual market . . .;
4. The physical presence or absence of family members on the farm;
5. Ownership of traditional farm assets;
6. Whether the debtor is involved in the process of growing or developing crops or livestock; and
7. Perhaps the key factor is whether or not the practice or operation is subject to the inherent risks of farming.

*Sugar Pine Ranch*, 100 B.R. at 31 (internal citations omitted) (citing *In re Maike*, 77 B.R. 832, 839 (Bankr. D. Kan. 1987); *In re Hampton*, 100 B.R. 535, 537 (Bankr. D. Or. 1987)). *See also In re Poe*, No. 08-906, 2009 WL 2357160, at *5 (Bankr. N.D.W. Va. July 29, 2009) (considering a "risk-laden" approach to determining whether activity constituted a farming operation, considering the typicality of the enterprise and the extent to which an operation was subject to the inherent risks of farming).

In the instant case, while the Carters purchased their land decades ago as farmland, historically engaged in farming operations, lease farmland to their son, and reside at the farm, many of the enumerated factors militate against the Debtor's claim that the sale of gravel constitutes farming. The nature and enterprise of excavation and crushing rock into aggregate and gravel is not characteristic of farming enterprises; the sale of gravel to construction, road paving, and assorted other contracting projects is markedly distinct from usual markets for farm products; machinery associated with the production and sale of gravel is far more akin to mining assets than traditional farm assets; and while the Debtor is engaged in the process of developing gravel, gravel is not grown or developed like crops or livestock. Rather, entirely unlike raising crops or livestock, gravel is not renewable; once rocks are crushed to gravel and the gravel is sold, the rock supply will be depleted. And considering the key factor of whether or not the practice or operation is subject to the inherent risks of farming, the Debtor

15

testified that the production of gravel is not subject to the inherent risks of farming. The Debtor testified that inherent risks in farming include risks like drought, freezing weather, excess rain, wind, pestilence, and excessive temperatures, all risks that have the potential to destroy crops or livestock. The Debtor also acknowledged that while it might be unpleasant to crush rock in bad weather, the rock itself will prevail over the harshest of farming conditions, and that the risks of farming merely affect the strain on individuals engaged in the work of crushing rock rather than the product itself.

In determining that the sale of rock does not constitute a farming operation, *In re Miller* is instructive. *In re Miller*, 122 B.R. 360 (Bankr. N.D. Iowa 1990). In *Miller*, a former Chapter 11 debtor filed a Chapter 12 case to prevent a foreclosure. *Id*. at 362. The debtors raised crops, had off-farm employment, and had several tracts of land on which they grew timber. *Id*. In addition, the debtors operated their own sawmill where lumber was cut and dried in kilns. *Id*. The court was faced with the question of whether debts associated with the sawmill were debts arising out of a farming operation, as the answer to that question determined whether the debtors had sufficient farm-related debts to be eligible for Chapter 12 relief. *Id*. at 364. The court concluded that operating a sawmill did not constitute farming activity, and that even if growing timber constituted farming:

> . . . the operation of a sawmill is one further step removed from that logging activity and is beyond even an expansive view of a farming operation. The definition of a farming operation makes specific reference to the growing and cultivation of farm commodities in their unmanufactured state. The sawing, planing, and drying of lumber to be sold commercially, is clearly a manufacturing activity.

*Id.* at 365. Further, relying on *In re Dakota Lay'd Eggs,* 57 B.R. 648 (Bankr.D.N.D.1986) (selling chicken feed is not a farming activity), the court determined that each particular alleged farming function or activity had to be considered on its own as to whether it

constituted farming activity, and that the processing of lumber is not farming even if the precursor logging might constitute farming. *Id*.

Applying *Miller* in the instant case, even if the court were inclined to view the debtor's mining project as irrigation lake expansion constituting a farming operation, it does not follow that processing the resultant rock and selling aggregate or gravel is farming as well.

Thus, while the Debtor is engaged in some farming operations, she cannot count business associated with gravel production and sale among the activities of that operation.

### Aggregate debts are within the debt limit

Section 101(18)(A) next imposes a total debt limit of $4,153,150.00 on prospective Chapter 12 debtors. In the instant case, the Debtor has scheduled $2,022,347.64 in secured claims, $51,310.30 in priority claims, and $14,432.93 in unsecured claims, for a total of $2,088,090.87 in liabilities. The Debtor is well below the debt limit.

### Debts arising out of farming operations are less than 50% of total debts

To qualify as a family farmer, at least 50% of a debtor's aggregate noncontingent liquidated debts as of the petition date must arise out of the debtor's farming operation. § 101(18)(A). In arguing that this case does meet this threshold requirement that a debtor's debts arising out of farming operations exceed, non-farm-related debts, the Debtor totals her debts owed to Uwharrie and CFC for claims held against the real property, her property taxes due and owing to Stanly and Cabarrus Counties, and a debt owed to Kirby Stone and Timber ("Kirby"). According to the Debtor's Schedule D, CFC is owed approximately $507,000.00, and Uwharrie is owed approximately $340,000.00, for a total of $847,000.00 owed for the farm land. Per the Debtor's Schedule E/F, the Debtor owes approximately $51,000.00 in property taxes between Stanly and

17

Cabarrus counties.  And per Schedule D, the Debtor claims that $1,000,000.00 owed to Kirby is a debt allegedly arising out of farming.  According to the Debtor's Brief, the $1,000,000.00 loan from Kirby was for the purchase of several pieces of farm equipment, including a screening plant.[9]

At the hearing, the Debtor's testimony regarding the debt owed to Kirby did not comport with the picture painted in her brief.  The Debtor first testified that she was not a signatory to the Note establishing Kirby's claim, and when asked about a signature on the Note bearing her name, she denied that it was signed by her hand.[10]  Nonetheless, the Debtor did not challenge the validity of the debt, and appeared privy to certain details concerning the debt.  When asked for what purpose Kirby loaned the Carters $1,000,000.00, the Debtor answered that $25,000.00 of the sum was used for the purchase of the screening plant, and that she did not know what became of the remaining $975,000.00.  As the court has concluded that sifting aggregate and gravel does not constitute a farming operation, debt for the purchase of a screening plant is not debt arising out of farming.  Further, as the Debtor could not explain for what purpose the remaining Kirby debt was incurred, the Debtor failed to meet her burden of demonstrating that the entire $1,000,000.00 debt is debt arising out of a farming operation.

In the instant case, the Debtor's non-farm-related debt would have to be no greater than approximately $1.05 million to meet the requirement, as total aggregate noncontingent liquidated debts equal $2,088,090.87.  Therefore, when the $1,000,000.00 Kirby debt is added to the Ryan Mining debt, at least $150,000.00 of which is not related to farming, the Debtor's non-farm-related debts exceed $1.05 million.  Thus over 50% of

---

[9] A screening plant is a large piece of equipment used to sort crushed aggregate and gravel into like-size pieces so as to yield a more homogenous grade of gravel.

[10] The Debtor stipulated to the debts listed in her schedules, which includes the Kirby debt.

the Debtor's aggregate noncontingent liquidated debts as of the petition date do not arise out of farming operations.

### The Debtor's farming income is less than 50% of total income

The Debtor also fails to satisfy the final element of § 101(18)(A) to qualify as a family farmer pursuant to § 109(f), as the Debtor's income from farming is not more than 50% of her gross income for taxable year 2016, or for both taxable years 2014 and 2015.

Considering first the Carters' taxable income from 2016, the Debtor earned gross income of $13,048.00 as a school bus driver according to her and her husband's joint 2016 1040, and claims an additional $55,877.00 in gross income from farming according to her 1040 Schedule F. On face it would appear that gross income from farming far outweighs income from other sources. However, of that $55,877.00, a mere $6,000.00 was from the lease of farmland, and $46,802.00 was from the sale of gravel, which is not farming. Thus, in 2016, the Debtor earned less than 50% of her gross income as a farmer.

Similarly, the Debtor does not qualify as a family farmer for purposes of § 109(f) eligibility because her gross income was not at least 50% from farming activities in both taxable years 2014 and 2015.

While all parties concede that the Debtor's 2014 income from raising chickens and selling soybeans exceeds all other income and thus the final element of § 101(18)(A) is half-satisfied, the same is not true for 2015. In 2015, the Debtor earned $10,899.00 from her bus route, and her 1040 Schedule F reflects $6,008.00 from farming. However, only $654.00 of that $6,008.00 comes from the sale of goods that constitutes farming activity. Plus, even if all $6,008.00 were credited to farming activities, it is less than the Debtor's bus driving income, and the Debtor's largest share of 2015 income comes from

$41,000.00 in gravel sales, which is not farming.  Moreover, while the Debtor claims that she and Mr. Carter had income of approximately $41,000.00 from gravel sales in 2015, the court is unable to find with any degree of certainty that the Carters did in fact, receive that income.  The Carters' 2015 Federal Income Tax Return, admitted as Exhibit #5, does not disclose that the Carters earned $41,000.00.00 from gravel sales that year.  The Statement of Financial Affairs in the Debtor's previous case does not disclose that income.  Even the Debtor's own testimony as to whether she and Mr. Carter actually received those funds as income was inconsistent.  Thus, since the Debtor's gross annual income for taxable years 2014 and 2015 was not at least 50% from farming, the Debtor cannot satisfy the alternative offered in the final element of § 101(18)(A).

### BAD FAITH

Whether a Chapter 12 case should be dismissed for bad faith is governed by 11 U.S.C. § 1208(c), which instructs that, "on request of a party in interest, and after notice and a hearing, the court may dismiss a case under this chapter for cause . . . ."  The Fourth Circuit has held that filing in good faith is an implicit requirement in seeking relief under the Bankruptcy Code, and that the absence of good faith can constitute cause for dismissal.  *Carolin Corp. v. Miller*, 886 F.2d 693, 698 (4th Cir. 1989).  In discussing § 1112(b), the Chapter 11 counterpart to § 1208(c), the court in *Carolin Corp.* notes that the list of factors constituting cause under the statute is not exhaustive, and that the court may consider other factors that arise and use its equitable powers to reach an appropriate result.  *Id*. at 699 (quoting  H.R.Rep. No. 595, 95th Cong., 2d Sess. 406, *reprinted in* 1978 U.S.Code Cong. & Admin. News 5787, 5963, 6362).

The Debtor argues that under Chapter 12, there is no statutory requirement that a petition be filed in good faith.  While the Debtor acknowledges that petitions may not be filed nefariously, the Debtor argues that unlike Chapter 13, where § 1325(a) requires both that a proposed plan and a case be filed in good faith, the analogous § 1225 only

20

requires that a proposed plan be filed in good faith.  The Debtor thus concludes that a higher burden rests on parties seeking dismissal for cause in Chapter 12, and that dismissal requires a high legal standard of proving bad faith.  In support of her claims, the Debtor discusses several cases that adjudicate matters of bad faith or dismiss Chapter 12 cases after multiple failed confirmation attempts.  *See In re Dickenson*, 517 B.R. 622 (Bankr. W.D. Va. 2014)*; In re Burger*, 254 B.R. 692 (Bankr. S.D. Ohio 2000); *In re Massie*, 231 B.R. 249, 253 (Bankr. E.D. Va. 1999).

The Debtor's arguments are misplaced for three reasons.  First, Chapter 11 similarly only has one reference to bad faith in § 1129(a) with regard to filing a proposed plan, and yet the Fourth Circuit in *Carolin* understood the general existence of a good faith filing requirement; for Chapter 12 to be similarly silent does not support the Debtor's position.  Second, numerous bankruptcy courts have specifically interpreted § 1208(c) to include a good faith filing requirement, and cause under § 1208(c) is not reliant on confirmation.  *See, e.g., Burger*, 254 B.R. at 696; *Massie*, 231 B.R. at 253; *In re Fuhrman*, 118 B.R. 72, 75 FN 5 (Bankr. E.D. Mich. 1990); *In re Beswick*, 98 B.R. 900, 902 (Bankr. N.D. Ill. 1989); *In re Hyman*, 82 B.R. 23, 24 (Bankr. D.S.C. 1987); *In re Galloway Farms, Inc.*, 82 B.R. 486, 489 (Bankr. S.D. Iowa 1987); *In re Turner*, 71 B.R. 120, 122-123 (Bankr. D. Mont. 1987).  And third, in evaluating bad faith conduct, prepetition actions are equally relevant to post-petition actions.  The Debtor attempts to create a distinction by only relying on cases with post-petition bad faith conduct, but in the instant case the egregiousness of the Debtor's prepetition conduct rivals that of the debtors in the referenced cases, and must be evaluated by the court; the court sees no reason why prepetition egregious conduct by the Debtor should be excused.[11]

---

[11] Additionally, as this is the Carters' third bankruptcy case in as many years, and as one case has already been dismissed for bad faith, the instant case can be viewed as merely a continuation of the egregious conduct comprised of the Carters' actions since 2015.  The court need not wait for bad faith conduct to accumulate in this case.  Rather, the instant case already resembles cases that had been pending for far longer before they were dismissed for bad faith conduct.

The Debtor also argues in her brief that her case can proceed, as she has made a $5,000.00 good faith payment:

> Additionally, even though no proposed plan is even due for two months, and plan payments under such plan would not be due for at least the same period of time, the Debtor has already made a good faith payment of $5,000 into her case to cover administrative expenses and have an amount on hand to pay into the plan when confirmed and intends to continue doing the same in the months leading up to plan proposal and confirmation.

(Docket No. 38, pp. 15-16). This sentiment is echoed in the Debtor's affidavit, "In this bankruptcy petition, I have already made a payment of $5,000 to my case and to help cover administrative expenses and have money available to pay into the plan when it is confirmed." (Docket No. 40, para. 21). As previously noted, the Debtor's Statement of Financial Affairs lists a $5,000.00 payment made to Davis Nardone, PC for "Attorney Fees – retainer to bill against and to cover court filing fees," and to date the only administrative expenses associated with this case are attorney fees.

The court finds multiple aspects of this $5,000.00 payment misleading. First, the Debtor's Brief and supporting affidavit identify the Debtor individually as the payer, and the Debtor's testimony corroborates that statement. However, the Debtor's Statement of Financial Affairs identifies the $5,000.00 payment as having come from Ben Clifton. Further, the court is unclear as to the meaning of the phrases "into her case" and "to my case," as neither phrase actually states that any payment has been made to the Trustee, and the Debtor's testimony identifying $5,000.00 paid in April is in reference to the payment to Debtor's counsel, not to a payment to the Trustee. The Debtor testified that the $5,000.00 payment made in April was to be the first of a series of payments to generate a pot of money from which to pay administrative costs including attorney fees and to be applied to her case upon successful confirmation. However, the $5,000.00 that the Debtor styled as a good faith payment is not actually for

22

the benefit of creditors; rather, creditors are the would-be incidental beneficiaries of any residual funds, after attorney fees and filing fees, were the case to proceed through to a successful confirmation. Until the Trustee is holding payments to disburse post-confirmation, there have been no "good faith payments into the case."

Even were the court to set aside all reservations and interpret the Debtor's payment in the most favorable light as a good faith payment, the token gesture pales in comparison to the breadth of bad faith conduct on the part of the Carters, and ignores the severity of the Carters' prepetition conduct. Even were such a hypothetical good faith payment suggestive of the ability to satisfactorily reorganize, "[t]he possibility of a successful reorganization cannot transform a bad faith filing into one undertaken in good faith." *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1395 (11th Cir. 1988).

In determining whether a petition is filed in good faith, the moving party has the burden of proof, with the inquiry centering on whether there has been an abuse of the provisions, purpose, or spirit of the Bankruptcy Code. *Deans v. O'Donnell*, 692 F.2d 968, 972 (4th Cir. 1982); *see In re Brogdon*, No. 01-80488, 2001 WL 1699687, at *2 (Bankr. M.D.N.C. Sept. 7, 2001) ("The party moving for dismissal has the burden of proof to demonstrate cause."). Courts must consider both the objective futility of reorganization as well as the subjective bad faith of seeking relief under the Bankruptcy Code. *Carolin Corp.*, 886 F.2d at 700–01. In so doing, courts must evaluate the totality of the circumstances. *Id.* at 701. This requires courts to consider the debtor's motivations in filing, and to discern whether the debtor sought to abuse the reorganization process, to cause hardship, or to delay creditors by invoking the automatic stay without intent or ability to reorganize. *In re Massie*, 231 B.R. 249, 253 (Bankr. E.D. Va. 1999).

While there is no definitive formulation of the totality of the circumstances, courts in the Fourth Circuit consider the proposed percentage repayment to unsecured creditors, the debtor's financial situation, the period of time payment will be made, the

23

debtor's employment history and future prospects, the nature and amount of the debtor's unsecured claims, the debtor's past bankruptcy filings, the debtor's honesty in representing facts, any particular unusual or exceptional problems facing the debtor, and the debtor's prepetition conduct. *Neufeld v. Freeman,* 794 F.2d 149, 152-53 (4th Cir.1986); *Deans*, 692 F.2d at 972; *In re Page*, 519 B.R. 908, 913 (Bankr. M.D.N.C. 2014) (applying the *Deans* and *Neufeld* factors in a Chapter 13[12] context).  *See Dickenson*, 517 B.R. at 635 ("Although mistakes and omissions certainly occur, when the debtor demonstrates a pattern of [dishonest] behavior, dismissal may be appropriate.").  Other courts have also considered the timing of the petition, how the debts arose, the debtor's motive for filing, whether the debtor intended to defeat state court litigation, whether the debt could be included in a Chapter 7 discharge, and whether the debtor was eligible to be a debtor pursuant to § 109.  *Page*, 519 B.R. at 913.  Some courts have also held that successive filings constitute prima facie evidence of bad faith.  *In re Walton*, 116 B.R. 536, 540 (Bankr. N.D. Ohio 1990) (citing *Matter of Oakbrook Vill., Inc.*, 108 B.R. 838, 844 (Bankr. S.D. Ga. 1989); *In re Wickliffe,* 106 B.R. 470, 473 (Bankr. W.D. Ky. 1989); In re Edwards, 87 B.R. 671, 674 (Bankr. W.D. Okla. 1988); *Hyman*, 82 B.R. at 24.).  Additionally, when faced with a repeat filing, courts have considered whether the debtor can show a change in circumstances.  *See, e.g. Hyman*, 82 B.R. at 24.

In the instant case, the court has grave concerns regarding the Carters' prior bankruptcy filings and finances, the Debtor's prepetition conduct, the lack of change in circumstances, and the Debtor's lack of honesty and candor in the current proceedings including the election to file a Chapter 12 petition.

---

[12] The court relied on *In re Page* in dismissing the Debtor's Chapter 13 case in 2016.

## Prior Bankruptcy Filings

As the court has already stated, the Carters have two prior filings.  The first Chapter 13 petition by Mr. Carter (Middle Case No. 15-51222) was filed in the Eastern District of North Carolina to prevent foreclosure by CFC and Uwharrie, transferred to the Middle District, and dismissed automatically for failure to file necessary schedules and statements.  The Debtor then filed her Chapter 13 petition (Middle Case No. 16-50228) in the Eastern District of North Carolina to stymie foreclosure sales set by CFC and Uwharrie.  The case was transferred to the Middle District, and was eventually dismissed.

At the April 13, 2017 hearing, the court began its hearing on the Movants' Motions to Dismiss by taking judicial notice of its findings of fact from the Chapter 13 dismissal hearing on July 6, 2016.  At the July 6 hearing, the court found a complete lack of honesty with both the Debtor and Mr. Carter in representing facts and an overall lack of candor with the court.  The court further found that the Debtor's first set of schedules in her Chapter 13 case were "abysmally deficient" to the point that the court questioned how it was possible they could be so riddled with inaccuracies; the amended schedules were also found inaccurate.  The court additionally found that both the Debtor and Mr. Carter were "repeatedly and intentionally evasive in their testimony and even made false statements at times."  At the July 6 hearing, it also came to light that Mr. Carter let his case lapse because he believed himself over the debt limit for Chapter 13 because of the Kirby debt.  The Debtor was also an obligor on the debt and thus was over the debt limit with a pending motion to convert.  The court noted that, months into a second filing by the Carters, the Debtor's Chapter 13 case was above the debt limit for exactly the same reasons that Mr. Carter testified he intentionally allowed his Chapter 13 case to be dismissed.  The Debtor should have been fully aware of the consequences of

25

exceeding the debt limit, but elected to file a Chapter 13 case regardless, and only when facing dismissal did she attempt to convert to Chapter 11.

### Prepetition conduct

It appears clear from the record that the Debtor's motive in filing was to prevent foreclosures by Uwharrie and CFC; the Debtor filed for Chapter 12 on the last day of the 10-day upset bid periods in each of the foreclosures.  Taken alone, this in itself is not unusual, and many debtors file emergency petitions under similar circumstances.  However, the Debtor's foreclosures did not proceed in the usual fashion, and the actions of certain parties connected to the Carters during Uwharrie's and CFC's respective foreclosure sales are highly suspect.

In the case of CFC's foreclosure sale, Ryan Mining filed the first bid of $411,075.00 on August 22, 2016. Between August 22 and October 27, 2016, Ben Clifton, Ryan Mining, and James Potts filed a total of 7 upset bids with no bidder making consecutive upset bids, and with an ending price of $750,000.00 by Ryan Mining.  On November 7, 2016, the tenth and final day on which an upset bid could be filed, James Potts filed an upset bid for $787,500.00, and proceeded to upset his own bid on the tenth and final day of each upset bid period 9 times in a row before the substitute sale trustee sought to increase the bidding stakes from a 5% deposit to a 5% deposit plus a 95% compliance bond.  On February 8, 2017 the Stanly County Clerk of Court entered an order consented to by the trustee, CFC, and the Carters[13] instituting the compliance bond requirement starting for all bids filed on or after March 1, 2017.  By the end of February, James Potts had filed three additional upset bids, the final bid for $1,346,892.26 on February 28, 2017, the last day to file an upset bid without posting a 95% compliance bond.  And as of the first running of the upset bid period with the

---

[13] Ben Clifton signed the consent order as attorney for the Carters.

compliance bond requirement in place, rather than continuing to upset his own bids, James Potts did nothing and the Debtor filed her Chapter 12 petition.

Uwharrie's foreclosure sale shares a similar narrative, with competitive bidding between Jerry and Joseph Burleson; NC-SDS, LLC; Ben Clifton, Gwynn-Edwards, PLLC; and Ryan Mining until Ryan Mining filed an upset bid for $500,000.00. Following that $500,000.00 bid, Ben Clifton upset bid himself repeatedly until a similar consent order was entered, with Ben Clifton's final upset bid filed February 28, 2017.

Counsel for Uwharrie noted at the hearing that it is exceedingly unusual to upset one's own bid, especially if a bidder truly desires to own the property. At the hearing, counsel for the Debtor argued that the foreclosure bid processes were merely state court issues that were resolved by state court orders, and that no evidence had been presented that the Debtor had either coerced or asked either James Potts or Ben Clifton to bid on her behalf. The Debtor also argued that it was unknown at whose behest Mr. Clifton was bidding, as his bids were placed in his official capacity as attorney "Ben Clifton, Gwynn-Edwards, PLLC."

The court is of accord with the Movants, and repeated upset bids by known acquaintances, associates, or agents of the Carters suggest an attempt to hinder or delay the completion of the foreclosure sales. The Debtor's contention that Ben Clifton's actions were in an attorney capacity rings hollow, as like James Potts, he continued to file upset bids against himself. Although the Debtor testified that she herself did not make requests of James Potts or Ben Clifton, the Debtor was evasive in addressing whether Mr. Carter might have spoken to either of the men, and the Carters' ties to both men are admitted to in the Debtor's testimony. As previously noted, the Debtor lists Ben Clifton as the source of the $5,000.00 payment to her bankruptcy counsel. The court's inference is only further supported by the Debtor filing for bankruptcy at the first instance after a compliance bond requirement was added to the good faith deposit.

27

The Debtor's attempts to stall the completion of CFC's and Uwharrie's respective foreclosure sales is reminiscent of *In re Walton*. 116 B.R. 536. In *Walton*, the debtor filed three Chapter 12 petitions in the span of three years. *Id*. at 538. His first case was converted to Chapter 11 and subsequently dismissed, his second case was dismissed for failure to qualify for Chapter 12 relief, and in his third case the debtor wished to litigate ownership of real property previously adjudicated a fraudulent transfer in addition to seeking conversion to Chapter 11 due to repeat ineligibility for Chapter 12. *Id*. The court found that, "His motivation for seeking title 11 protection appears to be his 'desire for delay and increase the already substantial costs incurred by other parties.'" *Id*. at 540 (quoting *In re Walton*, 95 B.R. 514, 515 (Bankr. S.D. Ohio 1988)).[14] At the hearing, the debtor admitted that it was an attempt at foreclosure that drove his decision to file another petition, and that he only filed for bankruptcy to halt the foreclosure. 116 B.R. at 540. The court found that the debtors' actions were, "frustrating legitimate efforts of a creditor to enforce its rights under state law, is further indicia of bad faith." *Id*; *see also Burger*, 254 B.R. at 697 (concluding that the debtor filed for bankruptcy only to stay the sale of horses "because she couldn't think of any other way to prevent the sale," and that she had no need for reorganization, filed a skeleton petition, and did not qualify for Chapter 12 relief); *Massie*, 231 B.R. at 253 ("In the case at bar, we find debtor's sole purpose in filing her petition was to frustrate the legitimate process of a non-bankruptcy forum.").

Similarly, in the instant case, it appears clear that the driving purpose behind the Debtor filing her Chapter 12 petition when she did was to frustrate the legitimate efforts of both CFC and Uwharrie to enforce their rights under state law, and that filing for

---

[14] In the order dismissing the *Walton* debtor's second case, the court considered setting a hearing to consider the debtor's pleadings and various creditors' motions, but determined that no facts were subject to contest and all legal issues were previously determined against the debtor, and to conduct a hearing would only further the debtor's aims. 95 B.R. at 515.

bankruptcy is just the capstone to a series of upset bids in each respective foreclosure that, absent the 95% compliance bond requirements, would have likely continued indefinitely. Indeed, the prepetition conduct between the dismissal of the Debtor's last case and the filing of this case is the epitome of a dilatory scheme.

### Lack of changed circumstances

Here, the Debtor's circumstances are nearly identical to when she filed her Chapter 13 case in early 2016. In her Brief the Debtor cites *In re Fuhrman*, 118 B.R. 72 (Bankr. E.D. Mich. 1990) for the proposition that changed circumstances between cases may offer justification for repeat filings. (Docket No. 38, p. 12). The notion expressed by the *Fuhrman* court is analogous to motions to extend the automatic stay pursuant to § 362(c)(3) when multiple cases are pending within a 1-year period. The Debtor's reference to *Fuhrman* is notable, though, as in the instant case, the court can find no such changed circumstances. The Debtor is indebted to the same entities for approximately similar sums, the same foreclosures remain pending, the Debtor's business ventures remain basically unchanged[15] other than the added hope of obtaining chickens this summer, the vast amount of income projected in the last case has still not come to fruition, and the Debtor's dispute with Ryan Mining remains ongoing. The faults in the Debtor's Chapter 13 case perfectly mirrored the faults in Mr. Carter's case mere months earlier. Now, eight months after her Chapter 13 dismissal, the Debtor is in the same position acting in exactly the same fashion that led to her first dismissal.

---

[15] The exception is the Debtor's oral lease with her son for planting soybeans, which the Debtor failed to include in her amended schedules in her Chapter 13 case filed on June 5, 2016, after the oral lease had been entered into and after he had already planted his crops.

### Dishonesty and lack of candor

From the filing of this case, the Debtor has engaged with the court in a fashion lacking in both honesty and candor. Through her petition, schedules, and statements, the Debtor recharacterized her present business to support her position that she would qualify as a family farmer pursuant to § 101(18)(A). For instance, Question 27 of the Statement of Financial Affairs seeks details about ownership of or connections to any businesses within 4 years of filing for bankruptcy.  In the Debtor's Chapter 13, the Debtor listed one entity, Cedar Grove Farm, described as a poultry farm that existed from 1985 to 2014.[16]  (Case No. 16-50228, Docket No. 22).  No other business is listed on the Debtor's Chapter 13 Statement.  The Debtor's Chapter 12 Statement is therefore notable both for what it includes as well as what it excludes.  (Case No. 17-50262, Docket No. 36).  The Chapter 12 Statement leaves off any mention of Cedar Grove Farm, despite 2014 being within 4 years of 2017.  Further, the Statement includes J.F. Carter & Company, Inc., a farming business active from 1988 to present.  According to the Debtor's Brief, J.F. Carter & Company, is a business co-owned in equal 50% shares by the Debtor and Mr. Carter.  The Debtor's testimony further corroborated the joint ownership of J.F. Carter & Company.  However, when asked about the company at the April 13 hearing, the Debtor testified that the company was Mr. Carter's aggregate business.[17]  For her current Statement of Financial Affairs, the Debtor omitted the business in which she was engaged up until 2014 that did constitute farming, and characterized a business interest she had omitted in her Chapter 13 disclosures as a farming operation when her own testimony later established that the business was not engaged in farming.

---

[16] The Debtor did testify that her final year of raising poultry was 2014.

[17] The Debtor's testimony made no mention of J.F. Carter & Company engaging in farming.

The Debtor also made multiple false statements regarding crops.  On Schedule A/B, the Debtor listed that she had "Soybean and wheat crops" either growing or harvested with a value of $2,500.00.  During her testimony, the Debtor admitted that she owned no crops either on the date of the petition or the hearing, that it was too early in the season to have even planted crops as mid-April is when the last frost typically occurs, and that her statement on Schedule A/B was false.  Further, the Debtor signed an affidavit which was filed in response to the Motions to Dismiss, stating that she intended to plant soybeans in 2017, only to later directly contradict her sworn statement while giving testimony.[18]  (Docket No. 40, Exhibit 1, para. 15).  Taken alone, many of these discrete instances of dishonesty or lack of candor are troubling.  But considered together, these instances are even more troubling as they support an inference that the Debtor made a concerted attempt to use an inappropriate chapter of the Bankruptcy Code.

While the Debtor's schedules in the instant case are in better condition than either set in the Chapter 13 case,[19] there remain numerous questions about the accuracy of some information, and certain details—for instance, the nature of the J.F. Carter & Company, Inc.—were directly contradicted during the Debtor's testimony.  The court also cannot trust the veracity of the Debtor's tax returns, as the Debtor testified that her 2015 and 2016 federal income tax returns were in need of revision in light of errors brought to attention during her testimony. On the Debtor's 2016 Form 1040 Schedule F, which the Debtor introduced as an exhibit, the Carters list $46,802.00 in "sales of livestock, produce, grains, and other products you raised."  Ex. 6, page 9, line 2.

---

[18] The Debtor attempted to justify recharacterizing the dredging and draining of the irrigation lake as farming activity, since the submerged soil that was dredged was distributed across the fields to improve topsoil quality. The Debtor testified that the irrigation lake held water, and that they filled it about a month prior to the hearing, which coincides with the date on which she filed a Chapter 12 petition claiming to be a farmer involved in expanding an irrigation project.

[19] In particular, the real property portion of Schedule A/B in the instant case appears to have been prepared with diligence and care.

31

However, the Debtor testified that that sum was attributable to the sale of crushed rock in 2016, and when asked about its being reported as derived from products the Debtor "raised," as the form states, the Debtor blamed her tax preparer for the error. But the Debtor could less easily explain why, under line A, her principal crop or activity was reported as "poultry." The court has already noted that the various statements the Debtor has made about her 2015 income are riddled with inconsistencies.

A recent case from the Western District of Virginia is instructive. In *In re Dickenson*, the court dismissed a Chapter 12 debtor's case after multiple revisions to his schedules and numerous unconfirmable proposed plans failed to rectify the deficiencies in his case. 517 B.R. at 639. The court found that the debtor's actions demonstrated an inability to provide "full, clear, and trustworthy information" on which the court and parties could rely in reviewing the various matters in the case. *Id*. In addressing the delay, the court remarked:

> Mr. Dickenson's case has now been pending for several months, with no confirmed or confirmable plan and consistently inaccurate schedules, and there is little reason to be optimistic circumstances will change any time soon. As pointed out by the chapter 12 trustee at the June 5 Hearing, Mr. Dickenson has had ample time and opportunity to provide the Court and interested parties with accurate information, but he has failed to do so and has been unable to provide any meaningful explanation for the inaccuracies. Without accurate schedules, the Court, trustee, and creditors cannot determine the feasibility or propriety of a proposed plan, and the case cannot progress toward the ultimate goal of plan confirmation and discharge.

*Id.* at 632-633. The court noted that despite penalty of perjury schedules remained deficient, and stated that it was impossible to proceed without the "assurance of adequate disclosure of his assets and liabilities in his schedules." *Id*. at 633. In the Debtor's two cases, a similar pattern emerges. In *Dickenson*, despite multiple requests and directives from the trustee and the court to amend schedules, each amendment

yielded only more uncertainty with no satisfactory explanation. *Id*. at 635. Here, the Debtor has produced three sets of schedules across two cases, none of which are fully in accord with one another. Further, the Debtor's testimony in the instant case calls into question the veracity of the contents of her current filings, and the Debtor admitted while testifying that certain corrections were needed. In *Dickenson*, the court wrote, "This ruling is not one the Court takes lightly. As explained above, Mr. Dickenson did not merely make mistakes. His case was marred with omissions, contradictions, and tribulations, transforming it from that of the 'typical' to the 'atypical.'" *Id*. at 639. Here, the maze of contradictions and misstatements regarding even the most basic of foundational aspects of a case—such as income, sources of income, payments made, debts owed, and recent activities—has left the court incredulous. Indeed, the Debtor's filings are certainly atypical.

There were also other displays of dishonesty and lack of candor during the Debtor's testimony. For instance, the Debtor testified that she had not spoken to Ben Clifton, an attorney who made multiple upset bids in Uwharrie's and CFC's foreclosure sales, particularly in the former's, who represented her in state court, and who formed Barringer. When reminded by her attorney, she later stated that she was aware of Ben Clifton, that he was her attorney, that she had paid him legal fees, that he had appeared in the Ryan Mining state court suit and perhaps in other legal matters, and that she had known Ben Clifton for approximately 10 years. But she insisted that she knew not whether Ben Clifton was engaged in any business deals or joint ventures with Mr. Carter.[20]

In another instance, in discussing the $1,000,000.00 claim held by Kirby, the Debtor stated that she had not signed the Note that appeared to bear her signature, but

---

[20] It should be noted that Ben Clifton paid $5,000.00 to Davis Nardone, PC for the Debtor, as stated on the Debtor's Statement of Financial Affairs.

at the same time did not suggest that she did not owe a debt to Kirby.  Further, she testified that she knew not what became of the $1,000,000.00, save for approximately $25,000.00 that was used to purchase a screening plant that she no longer owns.  The Debtor's testimony regarding Ben Clifton and Kirby are indicative of the tenor and nature of the entire hearing, and the Debtor approached testifying in an evasive, willfully blind, and at times combative fashion.  The sheer volume of inaccuracies, misstatements, and contradictions render the Debtor's testimony not credible, and overall supports a finding of bad faith.

## CONCLUSION

In sum, the Debtor does not qualify for relief under Chapter 12 of the Bankruptcy Code as she is not a family farmer pursuant to § 101(18)(A), and is thus ineligible to seek Chapter 12 relief according to § 109(f).  The Carters' prior filings and abuses of the Bankruptcy Code; the concerted efforts to forestall completion of multiple foreclosure sales; and the lack of honesty and candor in addressing the court all support a finding that the Debtor filed the instant Chapter 12 case in bad faith, and that the case should accordingly be dismissed.

Uwharrie and Ryan Mining have both asked for the Debtor to be barred from refiling for bankruptcy for 3 years.  (Docket Nos. 12, 20).  While there is no precedent for a 3-year bar, and while the parties provide no authority to support their request for a 3-year bar, bankruptcy courts in this district have imposed a one-year ban on refiling when warranted. *See, e.g.*, *In re Carpenter*, No. 13-50305, 2013 WL 1194865, at *3 (Bankr. M.D.N.C. Mar.  22, 2013) (finding that the debtor had failed to make any meaningful attempt in any of the four bankruptcy cases he filed, constituting bad faith, unreasonable delay, and prejudice to creditors); *In re Brogdon*, No. 01-80488, 2001 WL 1699687, at *3 (Bankr. M.D.N.C. Sept. 7, 2001) (determining that a debtor deceiving a creditor using a falsified discharge order, omitting assets and liabilities on the debtor's

34

schedules, and failing to appear to provide testimony constituted sufficiently egregious conduct to justify dismissal with prejudice). This court is inclined to follow suit, given the egregious circumstances present in this case. Therefore, the court's Order bars the Debtor from filing a petition under any chapter of the Bankruptcy Code for a period of 1 year from the date of dismissal.

Uwharrie and Ryan Mining have also asked for further sanctions.[21]  Neither party has specified under what authority the court might further sanction the Debtor, and no evidence has been offered in support of such a request.  Accordingly, the court's Order does not further sanction the Debtor.

**[END OF DOCUMENT]**

---

[21] At the hearing, counsel for Uwharrie suggested that additional sanctions might, among other things, include the creditors' attorney fees.

# SERVICE LIST

ALL PARTIES OF RECORD AS OF THE DATE OF THE ORDER SHALL BE SERVED BY
THE BANKRUPTCY NOTICING CENTER